Jeffrey R. Krinsk, Esq. (SBN 109234)
jrk@classactionlaw.com
David J. Harris, Jr. (SBN 286204)
djh@classactionlaw.com
FINKELSTEIN & KRINSK LLP
501 West Broadway, Suite 1260
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

*Counsel for Plaintiffs and
the Putative Classes*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HECTOR PORTALUPPI and CARMEN PORTALUPPI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FORTIFI FINANCIAL, INC. (f/k/a Energy Efficient Equity, Inc.), and THE COUNTY OF LOS ANGELES,<br><br>Defendants. | Case No.: 2:20-cv-07959-ODW-RAO<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>Hearing</u><br><br>Date:    March 15, 2021<br>Time:    1:30 p.m.<br>Judge:   Hon. Otis D. Wright II<br>Courtroom: 5D |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................... 1

II.    SUMMARY OF FACTUAL ALLEGATIONS ........................................................ 2

III.   THE COURT HAS ARTICLE III JURISDICTION ............................................... 5

       A.    THERE IS NO "FACTUAL CHALLENGE" TO PLAINTIFFS' ARTICLE III STANDING ................................................................................ 5

       B.    PLAINTIFFS HAVE ARTICLE III STANDING ....................................... 6

       C.    DEFENDANTS' LIMITED, POST-LAWSUIT CONCESSIONS DO NOT DEPRIVE THE COURT OF ARTICLE III JURISDICTION .................... 7

IV.    CALIFORNIA'S "LITIGATION PRIVILEGE" DOES NOT RENDER FORTIFI IMMUNE FROM PRIVATE SUITS ........................................................................ 10

V.     THE MERE EXISTENCE OF A STATE REGULATOR DOES NOT FORECLOSE PLAINTIFFS' CLAIMS .......................................................................................... 12

VI.    PLAINTIFFS SUFFICIENTLY ALLEGE SECTION 1983 CLAIMS ................. 13

       A.    THE EQUAL PROTECTION CLAUSE HAS NOTHING TO DO WITH THIS CASE. ................................................................................................ 13

       B.    A PROPER DUE PROCESS ANALYSIS SHOWS THAT CALIFORNIA'S PACE STATUTES ARE FACIALLY UNCONSTITUTIONAL. ................. 14

       C.    THE COUNTY'S REMAINING § 1983 ARGUMENTS ARE MERITLESS .......... 17

VII.   THE FAC SUFFICIENTLY STATES CIVIL RICO CLAIMS ............................ 19

       A.    SECTION 1962(a) DOES NOT REQUIRE A PERSON-ENTERPRISE DISTINCTION ............................................................................................ 19

       B.    DEFRAUDED GOVERNMENTS CAN BE "ENTERPRISES" UNDER § 1962(c) 19

       C.    THE FAC ALLEGES MORE THAN AN "ORDINARY BUSINESS RELATIONSHIP" BETWEEN FORTIFI AND THE CRIMINAL CONTRACTORS ........................................................................................ 21

VIII.  DEFENDANTS' REMAINING ARGUMENTS ARE MERITLESS ................... 22

       A.    PLAINTIFFS ADEQUATELY STATE CLAIMS FOR FINANCIAL ELDER ABUSE ...................................................................................................... 22

       B.    FORTIFI VIOLATED CAL. BUS. & PROF. CODE § 7159.2(b) ............ 23

       C.    PLAINTIFFS' $1,000 ARE RECOVERABLE ON THE MERITS ........... 24

IX.    CONCLUSION ...................................................................................................... 25

1

# <u>TABLE OF AUTHORITIES</u>

2

## <u>Cases</u>

3

*Action v. Cty. of Santa Monica*
  41 Cal.4th 1232 (2007)...................................................................................... 11

4

*Anton Motors, Inc. v. Powers*
  644 F.Supp. 299 (D. Md. 1986) ....................................................................... 20

5

*Arreola v. Godinez*
  546 F.3d 788 (7th Cir. 2008)............................................................................... 8

6

7

*Bd. of Regents v. Roth*
  408 U.S. 564 (1972) .......................................................................................... 15

8

*Berry v. Am. Express Publishing, Inc.*
  147 Cal.App.4th 224 (2007)............................................................................. 22

9

10

*Campbell-Ewald Co. v. Gomez*
  577 U.S. 153 (2016) ............................................................................................ 7

11

*Cel-Tech Commc'ns, Inc.v Los Angeles Cellular Telephone Co.*
  20 Cal.4th 163 (1999)....................................................................................... 12

12

13

*Chen v. Allstate Ins. Co.*
  819 F.3d 1136 (9th Cir. 2011)............................................................................. 8

14

*Chevron Corp. v. Donziger*
  974 F. Supp. 2d 362 (S.D.N.Y. 2014).............................................................. 19

15

16

*Clark v. State*
  739 F.Supp.2d 1168 (N.D. Cal. 2010) ............................................................. 18

17

*Cleburne v. Cleburne Living Ctr. Inc.*
  473 U.S. 432 (1985) .......................................................................................... 13

18

19

*Consumer Adv. Gr. v. Kintetsu Ent. of America*
  129 Cal.App.4th 540 (Cal. Ct. App. 2005) ...................................................... 12

20

*Curry v. Yelp Inc.,*
  875 F.3d 1219 (9th Cir. 2017)............................................................................. 5

21

22

*Daum v. Spinecare Medical Group*
  52 Cal. App. 4th 1285 (1997)........................................................................... 12

23

*Eckhardt v. State Farm Bank FSB*
  2019 WL 1177954 (C.D. Ill. Mar. 13, 2019) .................................................. 24

24

25

*Elrod v. Burns*
  427 U.S. 347 (1976) ............................................................................................ 6

26

*F.C.C. v. Beach Communications*
  508 U.S. 307 (1993) .......................................................................................... 14

27

28

*Fair v. United States E.P.A*
  795 F.2d 851 (9th Cir. 1986)..................................................................6

*Fid. & Guar. Life Ins. Co. v. Chiang*
  No. 2:14-cv-01837 JAM CKD (E.D. Cal. Nov. 12, 2014) .........................15

*Just Film, Inc. v. Buono*
  847 F.3d 1108 (9th Cir. 2017) ...............................................................24

*Flintkote Co. v. Lysfjord*
  246 F.2d 368 (9th Cir. 1957) ..................................................................9

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*
  528 U.S. 167 (2000) ...............................................................................9

*Grand Canyon Trust v. Williams*
  98 F. Supp. 3d 1044 (D. Ariz. 2015) .......................................................8

*Grant v. Union Bank*
  629 F.Supp. 570 (D. Utah 1986) ...........................................................20

*Haro v. Sebelius*
  747 F.3d 1099 (9th Cir. 2014) ................................................................7

*Herzog v. "A" Company, Inc.*
  138 Cal.App.3d 656 (1982) ...................................................................12

*Honolulu Weekly, Inc. v. Harris*
  298 F.3d 1037 (9th Cir. 2002) ...............................................................13

Huang v. Garner
  157 Cal. App. 3d 404 (1984) .................................................................12

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*
  MDL No. 2672 CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017)..............6

*Jackson Water Works, Inc. v. Pub. Util. Comm'n of Cal.*
  793 F.2d 1090 (9th Cir. 1986) ...............................................................14

*Jacob B. v. City of Shasta*
  40 Cal.4th 948 (2007) ...........................................................................11

*Jennings v. Emry*
  910 F.2d 1434 (7th Cir. 1990) ...............................................................19

*LiMandri v. Judkins*
  52 Cal.App.4th 326 (1997) ....................................................................11

*Liquid Air Corp. v. Rogers*
  834 F.2d 1297 (7th Cir. 1987) ................................................................9

*Luhr v. Berryhill*
  2018 WL 1536669 (N.D. Cal. Mar. 29, 2018) ........................................14

*Malabed v. N. Slope Borough*
  42 F. Supp. 2d 927 (D. Alaska 1999) .....................................................13

*Mathews v. Eldridge*
424 U.S. 319 (1976) .................................................................................... 15

*McGrath v. Johnson*
67 F. Supp. 2d 499 (E.D. Pa. 1999) ............................................................ 6

*Neitzke v. Williams*
490 U.S. 319 (1989) .................................................................................... 18

*Ortega–Melendres v. Arpaio*
836 F.Supp.2d 959 (D. Ariz. 2011) ............................................................ 6

*Pitts v. Terrible Herbst, Inc.*
653 F.3d 1081 (9th Cir. 2011) ..................................................................... 7

*Polion v. Colvin*
2013 WL 3527125 (C.D. Cal. Jul. 10, 2013) ............................................ 14

*Reves v. Ernst & Young*
507 U.S. 170 (1993) .................................................................................... 20

*RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co.*
56 Cal.App.5th 413 (2020) .................................................................. 10,11

*Smith v. Greystone Alliance, LLC*
772 F.3d 448 (7th Cir. 2014) ....................................................................... 8

*State Farm Fire & Cas. Co. v. Sup. Ct.*
45 Cal.App.4th 1093 (1996) ...................................................................... 12

*Stebley v. Litton Loan Servicing, LLP*
202 Cal.App.4th 522 (2011) ...................................................................... 22

*Sunrise Ret. Villa v. Dear*
58 Cal.App.4th 948 (1997) ........................................................................ 18

*Trinity Lutheran Church of Columbia, Inc. v. Comer*
137 S.Ct. 2012 (2017) .................................................................................. 9

*U.S. v. Delano*
825 F.Supp. 534 (W.D.N.Y. 1993) ........................................................... 19

*U.S. v. Hancock*
231 F.3d 557 (9th Cir. 2000) ..................................................................... 13

*U.S. v. Urban*
404 F.3d 754 (3d Cir. 2005) ...................................................................... 19

*Wilcox v. First Interstate Bk. of Oregon, N.A.*
815 F.2d 522 (9th Cir. 1987) ..................................................................... 19

*Wilton v. Mountain Wood Homeowners Ass'n*
18 Cal.App.4th 565 (1993) ........................................................................ 11

*Zinermon v. Burch*
    494 U.S. 113 (1980) ...................................................................................... passim

**STATUTES**

18 U.S.C. § 1962(a) ........................................................................................... 19

18 U.S.C. § 1956 ................................................................................................. 2

18 U.S.C. § 1957 .............................................................................................. 2,21

18 U.S.C. § 1961 ............................................................................................... 21

18 U.S.C. § 1962(c) .......................................................................................... 20

18 U.S.C. § 1964(c) .......................................................................................... 24

42 U.S.C. § 1983 ............................................................................................... 14

Cal. Bus. & Prof. Code § 7159.2(b) ................................................................ 24

Cal. Civ. Code § 47 ........................................................................................... 10

Cal. Evid. Code § 669(a)(1) ............................................................................. 12

Cal. Rev. & Tax Code § 1603(a) ..................................................................... 17

Cal. Rev. & Tax Code § 1604 .......................................................................... 17

Cal. Rev. & Tax Code § 1605(a) ..................................................................... 17

Cal. Rev. & Tax Code § 1605.4 ....................................................................... 17

Cal. Streets & Highways Code ("SHC") §§ 5898.10, *et eq.*, §§ 5900, *et seq.* ............... 1

Cal. Welf. & Inst. Code § 15610.30 ................................................................ 23

Cal. Welf. & Inst. Code § 15610.30(a) ............................................................ 23

Cal. Welf. & Inst. Code § 15610.30(b) ............................................................ 23

**OTHER AUTHORITIES**

Cal. Const. Article XIII, § 16 .......................................................................... 17

**RULES**

Fed. R. Civ. P. 9(b) ........................................................................................... 22

Rule 12(b)(6) .......................................................................................... 2, 18, 22

# I.     **INTRODUCTION**

California's Property Assessed Clean Energy ("PACE") Program arises from a flawed statutory scheme. *See* Cal. Streets & Highways Code ("SHC") §§ 5898.10, *et eq.*, §§ 5900, *et seq.* ("PACE Statutes").  The PACE Statutes allow local governments to collect "voluntary" taxes from homeowners, based on nothing but a private party's mere assertion that the homeowner agreed to pay.

The PACE Statutes, and California law generally, do not afford homeowners any process or procedure for disputing their alleged agreements.  Governments need not even communicate with homeowners before taxing them on a "voluntary" basis. So long as a private company tells the government that a homeowner owes money under a purported loan agreement, the government deploys its own tax powers to bill and collect the alleged debt from the homeowner.  Homeowners must pay their allegedly "voluntary" PACE-loan assessments or suffer property-tax penalties and other consequences of delinquency.  This is a clear deprivation of constitutional due process.  *See generally Zinermon v. Burch*, 494 U.S. 113 (1980) (holding that state actors allegedly deprived a man of due process by admitting him into a "voluntary" health facility, without taking steps to verify that he was competent to consent to admission).  The PACE Statutes allow local governments to collect homeowners' money *only* on a "voluntary" basis.  Yet the State and its governments take no steps to verify any homeowner's consent, reducing the requirements of due process to no process at all.

Because the State has acted to collect homeowners' money on behalf of private companies—at the mere words of those private companies—bad actors like Defendant FortiFi Financial, Inc. ("FortiFi") have taken advantage of the PACE Statutes' flaws. FortiFi has fraudulently originated PACE "loans" out of thin air, and used the County of Los Angeles ("County") and other local governments as its personal loan sharks to shake down vulnerable homeowners for cash.  To execute its schemes, FortiFi has

employed a network of shell companies, who essentially steal the homeowner data that FortiFi needs to fraudulently originate loans.

Tellingly, FortiFi's motion to dismiss does not dispute that Plaintiffs' First Amended Complaint (Dkt. 25) ("FAC") sufficiently alleges money laundering in violation of 18 U.S.C. § 1956, and transactions in criminally derived property in violation of 18 U.S.C. § 1957. While FortiFi argues that Plaintiffs' mail and wire fraud allegations are (somehow) insufficient, FortiFi's mail and wire fraud argument simply ignores most of the FAC's detailed allegations. Denying the existence of allegations that exist is no basis for a Rule 12(b)(6) dismissal.

The reality here is that FortiFi has allegedly been running an organized, State-enabled crime ring for half a decade. FortiFi's hub-and-spoke crime ring includes dozens of "Criminal Contractors," who defraud homeowners into divulging their personally identifying information ("PII"). FortiFi then uses homeowners' stolen PII to fraudulently originate PACE loans, and uses *governments* to blindly extract homeowner payments under color of the PACE Statutes. As a result, many of California's most vulnerable homeowners have suffered losses of their money and home equity, and have been deprived of their constitutional rights to due process.

## II. <u>SUMMARY OF FACTUAL ALLEGATIONS</u>

Plaintiffs Hector and Carmen Portaluppi are in their seventies and are less than fluent in English. ¶¶1-2.[1] In October 2018, con artists physically approached Plaintiffs' home. ¶¶2-15. The con artists offered (only orally, in Spanish) to make free, energy-efficiency "improvements" to Plaintiffs' house. *Id.* They told Plaintiffs that a government program would cover all of the costs. *Id.* Plaintiffs gave the con artists some of their PII, believing it would be used to apply for a free government program. *Id.* The con artists then transmitted Plaintiffs' PII to FortiFi as part of a forged, secured loan application. *Id.* The loan application was easy for the con artists

---

[1] All references to "¶" or "¶¶" refer to the numbered paragraphs of the FAC (Dkt. 25).

to forge without Plaintiffs' knowledge because it was unnotarized, and electronically signed and submitted to FortiFi. *Id.*; *see also* ¶¶96, 175.

That PACE loan application, like many others FortiFi received, was facially problematic. ¶¶47-53. For example, it sought to borrow over $39,000 for home "improvements" that would normally cost between $3,800 and $8,500. *Id.* That exorbitant pricing alone disqualified the application from approval under the PACE Program. ¶162. FortiFi employees saw those red flags and others. ¶¶47-53. FortiFi also knew that fraudulent PACE loans were common. ¶¶56-84. Despite all of those red flags, FortiFi fraudulently approved and originated the loan. ¶¶47-53, 60-61.

The reasons why FortiFi approved it are clear. For one, FortiFi's Underwriter Training Manual effectively precluded employees from conducting any good-faith analysis of PACE loan applications. ¶¶64-66. FortiFi also made a habit of terminating employees who made any waves about the problematic PACE loans FortiFi was routinely originating. ¶¶67-72. In sum, FortiFi employees were forced to choose between their integrity and their jobs. ¶¶64-72. Most chose their jobs.

FortiFi used interstate wires to transmit a fraudulent loan approval, in Plaintiffs' names, back to the con artists who had forged the application. ¶¶116-148. The con artists later sent FortiFi a "Completion Certificate," purporting to show that a $28,500 air conditioner had been installed at Plaintiffs' home. ¶¶126-132. The "Completion Certificate" contained glaring red flags similar to the loan application. ¶¶38-55. Nevertheless, FortiFi approved the Completion Certificate, and transmitted over $69,000 to the con artists, intending to collect that money back from Plaintiffs (via the County) with interest. ¶¶126-132.

FortiFi continued its heist by recording a $69,000 PACE lien against Plaintiffs' home in the County of Los Angeles. *Id.* In doing so, FortiFi knew that the County would blindly deploy the power of the State to extract that alleged "loan" money from Plaintiffs as part of their annual property tax bill. *Id.* And that is what the County did.

Beginning in October 2019, the County proceeded to add $7,384.44 *per year* to Plaintiffs' property tax bill, solely because FortiFi *told* the County that Plaintiffs had "volunteered" to pay that money.  ¶¶53-55, 130-132.  When Plaintiffs contacted the County to dispute their newly fabricated PACE "loan," County officials told them to go away. *Id.* The County confirmed that it *has no process or procedure* by which homeowners can dispute a PACE assessment once it has been originated.  ¶¶37, 95, 173-175.  The County told Plaintiffs to pay their imaginary debts or face tax penalties and other severe consequences of delinquency. ¶¶13, 55.

Plaintiffs had no good choice, so they took out a personal loan in the amount of $7,384.44 to pay off their robotic, local government oppressors and avoid delinquency on their property taxes.  *Id.* The County took Plaintiffs' borrowed money and remitted it back to FortiFi, based solely on FortiFi's *word* that it was "contractually" entitled to Plaintiffs' money.  ¶¶32, 52, 91.  Plaintiffs incurred about $1,000 of interest charges on the loan they used to pay the County.  ¶¶13, 55.  Their emergency loan only bought them about one year, to figure out how to deal with the remaining *$140,000.00* in total payments demanded on their *involuntary* tax debt.  ¶125.

Throughout that one year, Plaintiffs disputed their fraudulently created debt with the County.  ¶¶11-13, 88-91. Plaintiffs also disputed their PACE debt directly with FortiFi, by phone and in writing, going all the way up to Senior VP Laura Choi. *Id.*  In response, FortiFi: (1) lied to Plaintiffs; (2) blamed the door-to-door con artists who stole Plaintiffs' PII; (3) denied Plaintiffs any relief; and (4) mailed Plaintiffs a fraudulent "Reimbursement Agreement," which disclaimed responsibility and obligated FortiFi to do nothing.  ¶¶73-97.

FortiFi has been playing this game for a long time.  Since 2016 or earlier, FortiFi has arranged multiyear contracts with at least a dozen "Criminal Contractors," all of whom facilitated FortiFi's scheme by going door-to-door to extract homeowners' PII. ¶¶56-62. FortiFi then used homeowners' PII to knowingly originate and record fraudulent PACE assessments throughout California. *Id.* As a result,

4

Plaintiffs and the FortiFi Class have lost millions of dollars in cash and home equity, as local governments continue to blindly tax them at FortiFi's mere word.  ¶125.

FortiFi's far-reaching racket continues unabated today, only because the County and other governments refuse to give homeowners any process for challenging the legitimacy of their alleged "PACE loans."  ¶¶171-180.  The County refuses because the PACE Statutes and other State laws *nowhere* require it to provide such a process. *Id.*  This is extremely damaging to Plaintiffs, County Class members, and many other California homeowners.  *Id.*  In fact, it has been so damaging that the County is not currently allowing any new PACE loans to be originated.  ¶¶94-97.  The County, however, continues to blindly bill and collect the legacy PACE assessments remaining on its books, without giving homeowners any procedure for disputing the legitimacy of their "voluntary," "contractual" property-tax assessments.  *Id.*

## III.    THE COURT HAS ARTICLE III JURISDICTION

### A.    THERE IS NO "FACTUAL CHALLENGE" TO PLAINTIFFS' ARTICLE III STANDING

Defendants' Article III standing argument is based on the premise that they "assert a *factual* attack on subject matter jurisdiction."  Dkt. 29-1 at 9 (emphasis in original).  That feigned premise is simply false; there is no "factual" attack here, because the facts concerning Plaintiffs' Article III standing are currently undisputed.[2]

In October 2018, Plaintiffs incurred a financial debt secured by their house.  *See generally* Dkt. 25; Dkt. 32-1.  Between October 2018 and the filing of this lawsuit in August 2020, the County made Plaintiffs pay $7,384.44 in partial satisfaction of their debt.  *Id.*  To make those payments in a timely manner, Plaintiffs incurred another $1,000 in interest charges on an emergency personal loan.  Dkt. 25, ¶¶13, 55.[3]  After Plaintiffs filed this lawsuit demanding treble damages, interest, attorneys' fees and

---

[2] Plaintiffs do not concede the admissibility of any "evidence" filed by Defendants to date, but rely in part on their filings here, only to show their current factual positions.

[3] Defendants do not dispute this fact, and the Court must accept it as true on a motion to dismiss.  *Curry v. Yelp Inc.*, 875 F.3d 1219, 1224-25 (9th Cir. 2017).

expenses, FortiFi paid Plaintiffs $7,384.44, and filed a Notice of Addendum ("Addendum") with the County purporting to remove the lien on Plaintiffs' house.  *Id.* at n.6; Dkt. 32-1.  All of those facts are undisputed here.

Accordingly, there is no "factual" challenge to this Court's jurisdiction.  The only jurisdictional question here is a question of *law*: whether FortiFi's unilateral, post-lawsuit conduct somehow deprives the Court of its original jurisdiction in this case.  Decidedly, the answer is no.

### B.    PLAINTIFFS HAVE ARTICLE III "STANDING"

Monetary losses are sufficient to confer Article III standing on a plaintiff.  *Fair v. United States E.P.A*, 795 F.2d 851, 854 (9th Cir. 1986) (collecting cases). Deprivations of due process are also independently sufficient to confer Article III standing. *Zinermon*, 494 U.S. 113 at n.11 (explaining that "a deprivation of due process is actionable" to recover nominal damages even where "the lack of due process did not itself cause any injury"); *see also Ortega–Melendres v. Arpaio*, 836 F.Supp.2d 959, 980 (D. Ariz. 2011) ("The loss of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *McGrath v. Johnson*, 67 F. Supp. 2d 499, 506 (E.D. Pa. 1999) ("The violation of a constitutionally protected right is a sufficient injury for purposes of standing.").

Here, Plaintiffs say they were deprived of their money and home equity without due process, and due to fraud by a government contractor.  Specifically, Plaintiffs incurred a senior-secured lien on their house totaling $69,003 (plus fees and interest), were forced to pay $7,384.44 to the County, and incurred $1,000 in interest charges to make those payments and avoid tax penalties.  No court has held that such constitutional and financial injuries are somehow insufficient to confer Article III standing.

What Defendants are really arguing—in misleading fashion—is that Plaintiffs' pending claims are now "moot," due to the *partial* relief Plaintiffs obtained on their claims during this suit. *In re Volkswagen "Clean Diesel" Marketing, Sales Practices,*

*and Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2017 WL 4890594, at *3 (N.D. Cal. Oct. 30, 2017) ("This argument is better cast as one of mootness than of standing."); *accord* Dkt. 30 (Defendants arguing that FortiFi has "render[ed] Plaintiffs' claim[s] moot").   Settled law shows why Plaintiffs' claims are not "moot."

## C.    DEFENDANTS' LIMITED, POST-LAWSUIT CONCESSIONS DO NOT DEPRIVE THE COURT OF ARTICLE III JURISDICTION

Defendants' post-lawsuit payment to Plaintiffs does not deprive this Court of its original Article III jurisdiction for at least three, independent reasons.

*First*, putative class actions are not rendered "moot" by a defendant's unilateral attempts to redress only a named plaintiff's injury.  *See generally Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081 (9th Cir. 2011) (holding that mid-lawsuit offer of judgment for full amount of a named plaintiff's claim did not "moot" a putative class action); *Haro v. Sebelius*, 747 F.3d 1099, 1108-10 (9th Cir. 2014) (holding that a named plaintiff maintained Article III standing to assert due process claims where plaintiff "had been deprived of $103.87," but was reimbursed by the government "approximately one month after she filed this lawsuit").   There is no colorable argument here that *absent* Class members' claims are "moot" under Article III.  *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165 (2016) ("While a class lacks independent status until certified, [citation omitted] a would-be class representative with a live claim of her own must be accorded a fair opportunity to show that certification is warranted.").   In sum, picking off a named plaintiff who files a complaint with a live claim, does not by itself "moot" a putative class action.  *Id.*[4]

*Second*, on an individual basis, only a post-suit offer of the full relief a plaintiff demands can even possibly raise Article III questions.  *See generally Gomez*, 577 U.S. 153; *accord id.* at 182-83 (Roberts, C.J., dissenting) ("If the defendant is willing to

---

[4] While Defendants here seek to erase the pending claims of absent Class members via their motion to strike (Dkt. 30), Defendants' motion to strike lacks merit.  *See* Brief in Opposition to Defendants' Motion to Strike (filed concurrently herewith).

7

give the plaintiff *everything he asks for*, there is no case or controversy to adjudicate, and the lawsuit is moot."); *Id.* at 184 (Alito, J., dissenting)  ("I agree that a defendant may extinguish a plaintiff's personal stake in pursuing a claim by offering *complete relief on the claim* . . . .).[5]  This case is not "moot" because Defendants have not offered Plaintiffs the complete relief they demand on their claims.  For starters, Plaintiffs demand damages for the $1,000 in interest charges they incurred to make payments on their fake PACE loans.   Dkt. 25.  While Defendants say that such damages are "too remote" for Plaintiffs to recover (Dkt. 29-1 at 11-12), this is an argument that Defendants would have to make—but have not made—on the merits of each one of Plaintiffs' causes of action.   *Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008) ("Standing is a prerequisite to *filing suit*, while the underlying merits of a claim (and the laws governing its resolution) determine whether the plaintiff is *entitled to relief.*") (original emphasis); *Smith v. Greystone Alliance, LLC*, 772 F.3d 448, 453 (7th Cir. 2014) ("A court can't decide the merits and then dismiss for lack of jurisdiction.").[6]  Plaintiffs' $1,000 are recoverable on the merits, but this is no jurisdictional issue.  *Grand Canyon Trust v. Williams*, 98 F.Supp.3d 1044, 1057 (D. Ariz. 2015) (holding that courts "cannot consider the merits when deciding standing").

Moreover, Plaintiffs have demanded treble damages, punitive damages, permanent injunctive relief, and interest on their lost money, as well as attorneys' fees and expenses.  Dkt. 1; Dkt. 25.  It is undisputed that Defendants have not given Plaintiffs such relief, or otherwise offered to submit to any judgment in Plaintiffs' favor.  For these reasons too, the Court retains Article III jurisdiction over this case. *Chen v. Allstate Ins. Co.*, 819 F.3d 1136, 1138-39 (9th Cir. 2011) (holding that a pending claim can become moot only if "a plaintiff actually receives complete relief

---

[5] All emphasis within quotations is added unless otherwise stated.

[6] Defendants argue that Plaintiffs' personal loan losses are "too remote" to recover *only under the civil RICO statute*.  Dkt. 29-1 at 11-12. Defendants are wrong about RICO, and *silent* on whether Plaintiffs' $1,000 are recoverable on their other claims.

on that claim"); *Greystone Alliance*, 772 F.3d at 450 ("If the plaintiff asks for the moon, only offering the moon extinguishes the controversy."); *id.* ("A defendant cannot have the suit dismissed by making an offer limited to *what it concedes the plaintiff is entitled to receive*, even if the defendant happens to be right about its view of the plaintiff's entitlement, because deciding that entitlement resolves the merits."); *Volkswagen "Clean Diesel"*, 2017 WL 4890594, at *3-4 (holding that only treble damages can provide "[f]ull satisfaction" of claims for treble damages) (citing *Flintkote Co. v. Lysfjord*, 246 F.2d 368 (9th Cir. 1957)); *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1310 (7th Cir. 1987) ("We conclude that setting-off damages *after* trebling is more likely to effectuate the purposes behind RICO.") (original emphasis).

**Third**, the voluntary cessation of a challenged practice does not moot an Article III controversy, unless the defendant carries a "heavy burden" of making it "absolutely clear" that the defendant will not resume its original conduct. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, n.1 (2017); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190-91 (2000) (holding that a defendant must make it "absolutely clear" that the challenged conduct "could not reasonably be expected to recur"). Here, while FortiFi has filed an "Addendum" with the County withdrawing Plaintiffs' assessment, FortiFi has done nothing to show that it will not file a new "Addendum" tomorrow, reversing its stance. Nor has the County made any representation that it would not *act upon* such an amended "Addendum" from FortiFi. This precludes any finding of mootness.

In addition, one of the main allegations here is that FortiFi used Plaintiffs' stolen PII to fraudulently originate loans in Plaintiffs' names. FortiFi, an allegedly criminal organization, *still possesses Plaintiffs' PII today*. FortiFi has made it far from "absolutely clear" that it will not reuse Plaintiffs' PII to create illegitimate debts in Plaintiffs' names. The only things that Plaintiffs and the Court can be "absolutely clear" about today is that: (1) alleged fraudsters and money-launderers are in possession of Plaintiffs' PII; (2) they have used Plaintiffs' PII in the recent past to

9

create fake debts in Plaintiffs' names; and (3) the County is unable to stop FortiFi from creating fake debts in Plaintiffs' names.

Defendants have done nothing to carry their "heavy burden" of making it "absolutely clear" that their conduct "cannot reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190-91. Only the Court can provide Plaintiffs with the full relief they demand by: (1) enjoining FortiFi and its agents from retaining or using Plaintiffs' PII in the future; and (2) permanently enjoining the County from collecting PACE assessments, without affording homeowners due process of law. The question of whether Plaintiffs and the Classes will ultimately be entitled to judicial relief is the question to be answered after discovery, class certification, summary judgment, and trial. But none of this presents a *jurisdictional* issue.

For all three of the above reasons, this Court must continue to exercise its jurisdiction over Plaintiffs' claims, and must address Plaintiffs' claims on the merits.[7]

## IV.  CALIFORNIA'S "LITIGATION PRIVILEGE" DOES NOT RENDER FORTIFI IMMUNE FROM PRIVATE SUITS

FortiFi argues that "publicly recording PACE [assessments] is recognized as protected activity," and therefore, "any claims arising from that protected activity . . . are barred by California's litigation privilege." Dkt. 29-1 at 13. FortiFi cites no legal authority for that proposition because there is none. *Id.*

California's "litigation privilege" arises by statute, to protect people from being sued over statements they make in the course of a judicial proceeding. Cal. Civ. Code § 47; *see also RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co.*, 56 Cal.App.5th 413, 445 (2020) (explaining that the "principal purpose" of the litigation privilege "is to afford *litigants and witnesses* utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions"). FortiFi concedes that to be

---

[7] *DeFunis* is wholly inapposite because it was *not* a class action, and did *not* involve claims for actual or treble damages. *DeFunis v. Odegaard*, 416 U.S. 312, 316-17 (1974). There was no demand for any judicial relief in *DeFunis*, except a pointless injunction to prevent conduct that *could not possibly recur* against the plaintiff. *Id.*

privileged, a communication or publication must have some "'reasonable relation' to a judicial proceeding." Dkt. 29-1 at 13 (citing *Jacob B. v. City of Shasta*, 40 Cal.4th 948 (2007); *accord RGC Gaslamp*, 56 Cal.App.5th at 439 (privileged statements must "be reasonably relevant to pending or contemplated litigation"). FortiFi, however, goes on to argue that "the recording of *an[y]* assessment lien qualifies as a communication made in connection with a judicial proceeding." *Id.* (citing *Wilton v. Mountain Wood Homeowners Ass'n*, 18 Cal.App.4th 565 (1993)). That is false.

California law distinguishes between liens recorded for the purpose of enforcing defaulted debts, and liens recorded for the purpose of facilitating a credit transaction in the first place. Specifically, "*Wilton* distinguished a homeowners' [association's] assessment lien from a deed of trust," the latter of which is non-privileged. *LiMandri v. Judkins*, 52 Cal.App.4th 326, 347 (1997).[8] As the *LiMandri* court explained:

> Deeds of trust *are filed with the owner's consent and, at least initially, their purpose is to facilitate credit rather than to collect debts*. Although deeds of trust may be foreclosed judicially *after* a default, *they are not at their inception related to judicial proceedings*. In contrast to deeds of trust, [homeowners' associations'] assessment liens are imposed *unilaterally*, *only after a default* and *only* to initiate the foreclosure process.

*Id.* (quoting *Wilton*, 18 Cal.App.4th at 570). In this case, a PACE Assessment—like a deed of trust—should be recorded only "with the owner's consent." *Id.* Also like a deed of trust, a PACE assessment's initial "purpose is to facilitate credit," *not* to collect some preexisting, defaulted debt. *Id.* For this reason alone, no "litigation privilege" applies to PACE assessments, which "at their inception" have nothing to do with any actual or contemplated "litigation." *Id.*; *see also Action v. Cty. of Santa Monica*, 41 Cal.4th 1232, 1251 (2007) ("To be protected by the litigation privilege, a communication must be in furtherance of the objects of [a] litigation.").

---

[8] Deeds of trust "are practically and substantially only mortgages." *Robin v. Crowell*, 55 Cal.App.5th 727, 742 (2020). "[A] deed of trust is a lien on the property." *Id.*

FortiFi's fraudulent PACE-lien recordings are non-privileged for two additional, independent reasons: (1) they were part of a broader course of fraudulent and unlawful conduct; and (2) they were "not related to a potential judicial action contemplated *for legitimate purposes.*" *Herzog v. "A" Company, Inc.*, 138 Cal.App.3d 656, 662 (1982); *LiMandri*, 52 Cal.App.4th at 345. There is no statutory litigation privilege here.

## V.   THE MERE EXISTENCE OF A STATE REGULATOR DOES NOT FORECLOSE PLAINTIFFS' CLAIMS

FortiFi says that Plaintiffs have no state law "claims for negligence, UCL violations, [or] breach of contract," because California's Department of Business Oversight ("DBO") "is the statutorily-designated agency responsible for regulating the PACE industry . . . ." Dkt. 29-1 at 14-15. FortiFi cites no law to support its argument.

California courts consistently allow UCL claims for violations of statutes or regulations that do *not* provide private rights of action. *Consumer Adv. Gr. v. Kintetsu Ent. of America*, 129 Cal.App.4th 540, 570 (Cal. Ct. App. 2005) ("A plaintiff suing under the UCL may state a claim even where the unlawful action is based on a statute for which no private right of action and therefore no direct enforcement exists."). Statutes and regulations, under which an agency has some enforcement authority, are not exempt from serving as "predicates" for UCL claims. *State Farm Fire & Cas. Co. v. Sup. Ct.*, 45 Cal.App.4th 1093, 1102-03 (1996), *abrogated on other grounds by Cel-Tech Commc'ns, Inc.,* 20 Cal.4th 163 (1999) ("Virtually any law — federal, state or local — can serve as a predicate for a [UCL] action.").

Additionally, California negligence law expressly recognizes the doctrine of negligence *per se*, under which a presumption of negligence exists against defendants who have "violated a statute *or regulation.*" Cal. Evid. Code § 669(a)(1) (emphasis added). It is difficult to imagine how "violat[ing]" a "regulation" could support a negligence claim if, as Defendants espouse, the mere existence of a government regulator somehow precluded negligence claims. *Id.* That has never been the law. *See, e.g., Daum v. Spinecare Medical Group*, 52 Cal. App. 4th 1285, 1306

(1997); *Huang v. Garner*, 157 Cal. App. 3d 404, 413-414 (1984).  The mere fact that the DBO has some, limited involvement in regulating the PACE Program does not mean that unlawful conduct under the PACE Program is immune from suit.

Rather, FortiFi's violation of the PACE Statutes only bolsters Plaintiffs' claims for negligence, breach of contract and violations of the UCL. The Court must reject FortiFi's lawless argument that PACE administrators are immune from private suits.

## VI.  **PLAINTIFFS SUFFICIENTLY ALLEGE SECTION 1983 CLAIMS**

### A.  **THE EQUAL PROTECTION CLAUSE HAS NOTHING TO DO WITH THIS CASE.**

The County's legal brief correctly recites Plaintiffs' core constitutional assertion that the County, and the PACE Statutes, have deprived homeowners of procedural due process.  Dkt. 29-1 at 22 ("Plaintiffs apparently premise their Section 1983 claim on a lack of procedural due process under the Fourteenth Amendment."); *accord* Dkt. 25, ¶¶171-180.  That is the correct premise.  But then, the County proceeds to defend Plaintiffs' facial challenge to the PACE Statutes (Count IX) by arguing that the PACE Statutes satisfy so-called *"rational basis review."* Dkt. 29-1 at 24-25.

Rational basis review is a standard that applies under the Fourteenth Amendment's *Equal Protection Clause*, not the Due Process Clause.  *Compare, e.g., Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1047 (9th Cir. 2002) (explaining how to determine whether "rational basis review" applies to an alleged *equal protection* violation), *with Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (explaining that courts should "weigh" three "factors" to determine what procedures the *Due Process Clause* requires in a given case).  These two bodies of case law have literally nothing to do with each other; one addresses discriminatory practices by a State, while the the other addresses what a State must do before depriving *any* person of life, liberty or property.

Here, every decision the County cites for rational basis review (*i.e.,* dismissal of Count IX) is an *equal protection case*, not a due process case.  Dkt. 29-1 at 24-25; *Honolulu Weekly*, 298 F.3d at 1047 (applying rational basis review under the Equal

Protection Clause); *Malabed v. N. Slope Borough*, 42 F. Supp. 2d 927, 936 (D. Alaska 1999) (same); *Cleburne v. Cleburne Living Ctr. Inc.*, 473 U.S. 432, 440 (1985) (same); *U.S. v. Hancock*, 231 F.3d 557, 566 (9th Cir. 2000) (same); *Jackson Water Works, Inc. v. Pub. Util. Comm'n of Cal.*, 793 F.2d 1090, 1094 (9th Cir. 1986) (same); *F.C.C. v. Beach Communications*, 508 U.S. 307, 315 (1993) (same). None of these cases have anything to do with Plaintiffs' *procedural due process* claims, and nowhere does the County address the Supreme Court's settled test for evaluating what due process requires. *Zinermon*, 494 U.S. at 127. The County offers no serious argument to rebut Plaintiffs' facial challenge to the PACE Statutes. Even if the County manufactures a due process argument on reply, the County has already waived any new argument on reply. *Polion v. Colvin*, 2013 WL 3527125, at n.4 & n.7 (C.D. Cal. July 10, 2013); *Luhr v. Berryhill*, 2018 WL 1536669, at *21 (N.D. Cal. Mar. 29, 2018). The Court should thus deny the County's motion to dismiss Count IX as insufficiently argued.

**B.    A PROPER DUE PROCESS ANALYSIS SHOWS THAT CALIFORNIA'S PACE STATUTES ARE FACIALLY UNCONSTITUTIONAL.**

Even if the Court conducts its own due process analysis, such an analysis precludes any dismissal of Plaintiffs' § 1983 claims. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . , shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983. The constitutional "rights" lost by Plaintiffs here are their rights to procedural due process, as a condition of being deprived of their money "under color" of the PACE Statutes. 42 U.S.C. § 1983; Dkt. 25.

Procedural due process "is a flexible concept that varies with the particular situation" in question. *Zinermon*, 494 U.S. at 127. The Supreme Court has "usually" held "that the Constitution requires some kind of hearing *before* the State deprives a

person of liberty or property." *Id.*  In any case, courts must consider: (1) the private interest affected by government action; (2) the risk of an erroneous deprivation under the procedures used; (3) the "probable value" of additional or different procedural safeguards; and (4) the government's interest, including the government function involved and the administrative burden of additional procedures. *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Here, the PACE Statutes authorize local governments to collect property-tax assessments from homeowners, *only if* the assessments are "voluntary" and "contractual" on the homeowner's part.  SHC §§ 5898.12(g), 5898.14(b), and 5902(a). The PACE Statutes, however, impose no requirement that governments *verify* any homeowner's assent.  *See generally* SHC §§ 5898.10, *et eq.*; §§ 5900, *et seq.*  The PACE Statutes allow local governments to collect "voluntary" tax assessments, based solely on the mere assertions of companies who stand to benefit from the governments' collections. California law nowhere affords homeowners any process for disputing the "contractual" nature of their PACE debts. Examination of the *Mathews* factors, as reiterated in *Zinermon*, shows why the PACE Statutes, and the County's assessments thereunder, violate due process.

*First*, the "private interests" at stake here are homeowners' personal property interests in retaining thousands of dollars annually, and avoiding six-figure, senior-secured encumbrances on their houses. *Zinermon*, 494 U.S. at 127. This is a substantial property interest contemplated by the Due Process Clause. *Bd. of Regents v. Roth*, 408 U.S. 564, 571-72 (1972) (explaining that "the property interests protected by procedural due process extend [even] beyond actual ownership of real estate, chattels, or money"); *Fid. & Guar. Life Ins. Co. v. Chiang*, No. 2:14-cv-01837 JAM CKD, at *14 (E.D. Cal. Nov. 12, 2014) ("It is undisputed that money constitutes a property interest protected by the Fourteenth Amendment.").  Substantial property interests are at stake here, and on a wide scale.

**Second**, the risk of an "erroneous deprivation" under current PACE procedures is so high that the County itself recently discontinued all new PACE-loan originations. ¶94; *see also* http://pace.lacounty.gov (last visited Jan. 26, 2021) (explaining that the County "cannot be sure that [its current PACE procedures] will provide sufficient protection for all consumers").  The risk of erroneous deprivations is high because: (1) homeowners' "loan" documents are unnotarized, and only electronically executed; and (2) the County blindly finds the existence of PACE "agreements" based on the mere assertions of companies who stand to benefit from the County's "findings."  It should be no wonder why the PACE Program has been overwhelmed by fraud, as local governments stand ready to deprive homeowners of money *based on little more than a rumor*.  ¶94.

**Third**, allowing PACE debtors some reasonable opportunity to disprove the "voluntary" nature of their PACE assessments would go a long way toward preventing erroneous deprivations.  The only reason that PACE frauds have succeeded is that *there is no serious procedural safeguard against them*.  As long as private companies obtain access to homeowners' PII, and then tell the government that the homeowners owe money, the government blindly bills and collects the alleged debts.  Having governments hear directly from PACE debtors—*before* debtors are deprived of their money and home equity—would mean that homeowners could no longer be left in the dark by bad actors during PACE loan originations.  The "probable value" of State notice to the homeowner and an opportunity to be heard would be high, as governments could determine the fact of homeowner assent based on some modicum of evidence, not mere rumors started by private companies. *Zinermon*, 494 U.S. at 127.

**Fourth**, it is in local governments' interests to prevent erroneous deprivations in the PACE Program.  The government has no lawful or legitimate interest in collecting *involuntary* PACE assessments.  The government has every interest in making reasonable efforts toward things like identity verification, consent verification, and

compliance verification.  The County has simply failed to make any reasonable efforts to date, as the PACE Statutes require no reasonable efforts on the County's part.

Furthermore, the burden of giving alleged PACE debtors notice and a hearing would be minimal compared to the property rights at stake: money and a home.  At minimum, the State could require that: (1) all PACE loan applications and Completion Certificates be physically signed and notarized; and (2) homeowners be mailed (not e-mailed) hard copies of their alleged loan documents, and given a reasonable time to opt out of their PACE loans before they take effect.  The administrative burden of such procedural safeguards would be negligible, but California governments have failed to implement any safeguards at all.

In sum, the State and County have acted under color of the PACE Statutes to deprive homeowners of their money and property, without due process.  The County cannot collect property taxes on a "voluntary" basis, without taking any reasonable steps to verify whether a taxpayer has actually "volunteered."

## C.    THE COUNTY'S REMAINING § 1983 ARGUMENTS ARE MERITLESS.

The County contends that "properly noticed foreclosures" do not "require a due process hearing."  Dkt. 29-1 at 23-24 (citing inapposite decisions).  Plaintiffs' case has nothing to do with a run-of-the-mill foreclosure upon a mortgagor's default.  The point here is that local governments are deploying their tax powers, based solely on the *unchecked assumption* that a homeowner took out a loan in the first place.  There is no judicial precedent that even arguably justifies this.

Next, defense counsel (not the County) asserts that homeowners *can* dispute the "voluntary" nature of their PACE assessments through conventional property-tax appeal procedures.  That verifiably false assertion lacks any basis in law or fact.  Every constitutional provision, statute, and decision counsel cites for that assertion says only that homeowners can appeal the "base year" applied to, or the "value assessed" on, their properties.  Cal. Const. Article XIII, § 16 (providing that "the

county board of equalization . . . shall equalize the *values* of all property on the local assessment roll"); Cal. Rev. & Tax Code § 1603(a) (homeowners must file a "written application" showing "the applicant's opinion of the full *value* of the property"); Cal. Rev. & Tax Code § 1605(a) (referencing "subdivision (a) of Section 1603"); Cal. Rev. & Tax Code § 1605.4 (referencing "*[e]qualization* hearings"); Cal. Rev. & Tax Code § 1604 (county boards "shall meet to *equalize* the assessment of property on the local roll"); Cal. Rev. & Tax Code § 1605.5(a)(1) (boards "shall hear applications . . . in which the issue is whether or not property has been subject to a *change in ownership*");[9]  *Sunrise Ret. Villa v. Dear*, 58 Cal.App.4th 948 (1997) (same).  The bottom line is: there is no law stating or suggesting that any government review or appeal process exists for PACE debtors to dispute whether they took out private loans with third parties.

Moreover, the FAC alleges as a factual matter that *there is no government process or procedure* for resolving PACE "contract" disputes.  Defense counsel's bare argument that the Court should somehow find the opposite fact, at this stage, is wholly improper.  *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.").  Even assuming, *arguendo*, that "equalization" boards were available to resolve PACE disputes (they are not), the County has not shown how PACE victims

---

[9] For avoidance of doubt, this provision has nothing to do with the PACE Program.  It exists because a "change in ownership" sets a new "base year" for the *value* of a property.  Cal. Rev. & Tax Code § 75.8 ("'New base year value' means the full cash value of property on the date it *changes ownership* . . . .").  Disputes of fact may arise regarding "changes in ownership" because, *e.g.*, people use corporate entities to buy real estate, and avoid having their properties assessed at today's market prices.  For example, rather than Bob selling his house to Sue, "Bob, LLC" might hold the deed to Bob's house.  When Bob sells his house to Sue, he may not sell the house to Sue.  Instead, he may sell Sue *his stock* in "Bob, LLC."  Sue takes control of Bob, LLC, and thus the house.  Technically, the house never changed ownership; it was always owned by "Bob, LLC."  Thus, the State might not reassess the house at today's prices.  The State has caught on to such tax schemes, so it has fact-specific rules for determining whether a "change in ownership" has occurred.  *See, e.g.*, https://www.boe.ca.gov/proptaxes/pdf/rules/Rule462_180.pdf (visited Jan. 27, 2021).

are on fair notice of this. *Clark v. State*, 739 F.Supp.2d 1168, 1182 (N.D. Cal. 2010) ("[T]o fulfill the requirements of due process, notice must be reasonably calculated, under all the circumstances, to apprise interested parties of that which is noticed."). An opportunity to be heard is constitutionally meaningless if nobody knows about it. *Id.* The only thing for which current property-tax appeal procedures are clearly available is reassessing property values. Defense counsel's unsupported, feigned argument to the contrary lacks any basis in law or fact.

## VII.   THE FAC SUFFICIENTLY STATES CIVIL RICO CLAIMS

### A.   SECTION 1962(a) DOES NOT REQUIRE A PERSON-ENTERPRISE DISTINCTION

FortiFi says Plaintiffs' RICO claims for violation of 18 U.S.C § 1962(a)—Count I—must be dismissed because "the person named as the defendant cannot also be the entity identified as the enterprise." Dkt. 29-1 at 18. The case FortiFi quotes for that proposition says only (and correctly) that this is the law of § 1962*(c)*. Unlike § 1962(c), however, § 1962*(a)* allows the RICO "person" and "enterprise" to be the same entity. *E.g., Wilcox v. First Interstate Bk. of Oregon, N.A.*, 815 F.2d 522, 530 (9th Cir. 1987) ("We recently decided that unlike section 1962(c), sections 1962(a) and (b) do not necessarily require that the 'person' be distinct from the 'enterprise.'"). FortiFi's citation to § 1962(c) in favor of dismissing Count I—which is expressly premised on § 1962(a)—is wholly inapposite and misleading.

### B.   DEFRAUDED GOVERNMENTS CAN BE "ENTERPRISES" UNDER § 1962(c)

FortiFi contends it is "contradict[ory]" to allege that FortiFi defrauded the government, while participating in the management or operation of government affairs. Dkt. 29-1 at 18. There is nothing contradictory about this aspect of Count II. Government entities may constitute "enterprises" within the meaning of RICO. *U.S. v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005) ("[W]e have frequently found government entities to be 'enterprises' for RICO purposes."); *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990) ("[P]recedent teaches us that government offices can serve as

19

RICO enterprises."); *U.S. v. Delano*, 825 F.Supp. 534, 539 (W.D.N.Y. 1993) ("Public and governmental entities as well as private entities can constitute RICO enterprises."). Courts also agree that "enterprises" are sometimes among the "victims" of RICO violations, or the "instruments" used by perpetrators. *Chevron Corp. v. Donziger*, 974 F.Supp.2d 362, 576 (S.D.N.Y. 2014) ("Indeed, the enterprise frequently is itself a victim of the racketeering activity perpetrated by its participants."); *Anton Motors, Inc. v. Powers*, 644 F.Supp. 299, 301 (D. Md. 1986) ("The enterprise may be a passive instrument of the racketeering, or even a victim of the activities."); *Grant v. Union Bank*, 629 F.Supp. 570, 575 (D. Utah 1986) ("As shown by the above decisions, the enterprise is the instrument, often passive, and may be the victim of the culpable person's activities."). In sum, a RICO "enterprise" is not always one of the bad guys.

Here, Plaintiffs allege that the County and other governments have themselves been defrauded and have served as FortiFi's passive instruments. FortiFi fraudulently used local governments to execute its schemes by having them collect money from homeowners on fraudulent premises, and by having them remit the money to FortiFi.

Moreover, FortiFi has clearly "participate[d] in the conduct" of the County's and CMFA's "affairs" to execute its scheme. 18 U.S.C. § 1962(c). Section 1962(c)'s "conduct" element requires only that a RICO "person" participate in the "management or operations" of an enterprise's affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). *Reves* "makes clear" that only "*some* part in directing the enterprise's affairs is required." *Reves*, 507 U.S. at 179 (original emphasis). *See also id.* at 178 ("We conclude, therefore, that [§ 1962(c)] requires *an element* of direction."); *id.* at n.4 (rejecting the Court of Appeal's suggestion that § 1962(c) "requires 'significant control' over an enterprise). Here, FortiFi asserts that it "*partners* with LA County, in this case through the [CMFA] in making the PACE Program a success." Dkt. 29-1 at 4-5. FortiFi fully admits that it "*administers*" the CMFA's PACE Program, in part by "*manag[ing]* the application process" and "*financ[ing]* eligible improvements" for the CMFA's "numerous cities and counties." *Id.* Hence, FortiFi itself concedes that it

participates in the management and operations of the CMFA's and County's PACE Programs under § 1962(c).   This is not a close question.   FortiFi has thus "conduct[ed]" the "affairs" of a government "enterprise" under 18 U.S.C. § 1964(c).

## C.   THE FAC ALLEGES MORE THAN AN "ORDINARY BUSINESS RELATIONSHIP" BETWEEN FORTIFI AND THE CRIMINAL CONTRACTORS

FortiFi contends that Count III fails because Plaintiffs "fail to allege that FortiFi maintained anything other than an ordinary business relationship with Eco Tech." *See* Dkt. 29-1 at 18-19.  FortiFi is flatly misrepresenting the record.  The FAC alleges that "since 2016 or earlier," there have been at least a dozen "Criminal Contractors used by Defendant FortiFi/E3 to defraud homeowners and local government entities alike." ¶¶56-91.   Plaintiffs further allege that FortiFi has laundered money through those Criminal Contractors in violation of 18 U.S.C. § 1956, and engaged with those Criminal Contractors in transactions in criminally deprived property, in violation of 18 U.S.C. § 1957.  ¶¶116-148.  FortiFi's motion to dismiss *fully concedes* that the FAC adequately alleges violations of 18 U.S.C. §§ 1956 and 1957.   Dkt. 29-1. Furthermore, the FAC details how FortiFi has conspired with Criminal Contractors in a "shell game," substituting them in and out over time, and using them as the "fall guys" for FortiFi's own criminal misconduct.  ¶¶56-91.  In sum, the FAC alleges far more than just "an ordinary business relationship with Eco Tech."  Dkt. 29-1 at 18-19. Defense counsel knows that, which is why their blunderbuss motion is *silent* on FortiFi's alleged crimes of money laundering and transactions in criminally derived property.  *See generally* Dkt. 29-1.

## D.   RICO'S "PATTERN" ELEMENT IS CLEARLY SATISFIED

FortiFi correctly observes that a "pattern of racketeering requires <u>at least two</u> acts of racketeering activity."  Dkt. 29-1 at 19; 18 U.S.C. § 1961 (defining the term "pattern").   FortiFi also correctly observes that mail and wire fraud constitute "predicate acts" of "racketeering activity."  *Id.*  Bizarrely, however, FortiFi says that "[t]here are no allegations that FortiFi participated in any predicate acts."  Dkt. 29-1 at

20.  FortiFi also argues the FAC "lack[s] details as to the who, what, when, where and how" of FortiFi's frauds, and lacks any allegations "that FortiFi knew or should have known" about Criminal Contractor fraud.  *Id.*  These arguments are verifiably false.

The truth is that the FAC alleges FortiFi's multiyear pattern of mail fraud, wire fraud, and other predicate acts in painstaking detail.  *See generally* Dkt. 25.  The FAC's many paragraphs of specific allegations—which will not be recited here due to limited briefing space—amount to the following RICO "pattern," succinctly summarized.  Since 2016 or earlier, FortiFi has repeatedly used interstate wires and the mails to fraudulently originate and collect the proceeds of PACE loans, in collusion with no less than twelve, identified shell companies.  This included, among other things, originating "over $3 million" of fraudulent PACE loans in "a matter of six weeks" during 2017.  *Id.*, ¶60.

Moreover, several indicia of FortiFi's fraudulent intent over the years are alleged in detail throughout the FAC.  *E.g.,*  ¶¶56-91.  Such details regarding fraudulent intent are not even required by Rule 9(b).  Fed. R. Civ. P. 9(b) ("[C]onditions of a person's mind may be alleged generally.").  Once again, Defendants' motion to dismiss *does not dispute* that Plaintiffs' sufficiently allege FortiFi's "pattern" of money laundering, and transactions in criminally derived property.  Simply ignoring the existence of numerous, detailed allegations that exist is not a basis for seeking dismissal under Rule 12(b)(6).  *See generally* Dkt. 25.

## VIII.  <u>DEFENDANTS' REMAINING ARGUMENTS ARE MERITLESS</u>

### A.   PLAINTIFFS ADEQUATELY STATE CLAIMS FOR FINANCIAL ELDER ABUSE

FortiFi says that "[t]he origination of PACE assessments or recording related liens alone does not qualify as elder abuse" under California's Elder Abuse and Dependent Adult Civil Protection Act ("Elder Abuse Act").  Dkt. 29-1 at 21 (citing *Berry v. Am. Express Publishing, Inc.*, 147 Cal.App.4th 224, 229 (2007) and *Stebley v. Litton Loan Servicing, LLP*, 202 Cal.App.4th 522 (2011)).  Neither case stands for that

proposition. *Berry* does not even mention the Elder Abuse Act; it addresses only the Consumer Legal Remedies Act. *See generally Berry*, 147 Cal.App.4th 224. And *Stebley*, for its part, addresses neither the PACE Program nor *any* form of fraudulent loan origination or collection. *See generally Stebley*, 202 Cal.App.4th 522.

Defense counsel summarily asserts that "there are no factual allegations demonstrating that FortiFi knowingly deprived Plaintiffs or other elder class members of real or personal property." Dkt. 29-1 at 21. This is both irrelevant and untrue. As to relevance, intent is not a necessary element of financial elder abuse. Cal. Welf. & Inst. Code § 15610.30(b) (requiring that "the person or entity knew *or should have known* that [the property deprivation was] likely to be harmful to the elder"); *Stebley*, 202 Cal.App.4th at 527-28 (recognizing "bad faith or intent to defraud is no longer required in elder or dependent adult abuse cases"). FortiFi concedes that the FAC adequately alleges FortiFi obtained (and retained) Plaintiffs' money "for a wrongful use," within the meaning of the statute. Cal. Welf. & Inst. Code § 15610.30(a).

As to the falsity of counsel's assertion that "there are no factual allegations" of FortiFi's intent, such allegations are detailed throughout the FAC. Dkt. 25. The FAC alleges exactly how FortiFi knew that Plaintiffs and other FortiFi Class members were elders. ¶150. The FAC alleges exactly how FortiFi knew that "Plaintiffs'" forged PACE applications and Completion Certificates were fraudulent. ¶¶47-52. The FAC further alleges that Plaintiffs repeatedly complained and proved to FortiFi that they never applied for any PACE loan. ¶88. Nevertheless, FortiFi retained Plaintiffs' money with full knowledge that doing so was unlawful, and "likely to be harmful" to these elder Plaintiffs. Cal. Welf. & Inst. Code § 15610.30.

Again, simply denying the existence of allegations that exist is not a basis for dismissal. FortiFi makes no serious argument for dismissing Count IV.

## B.   FORTIFI VIOLATED CAL. BUS. & PROF. CODE § 7159.2(b)

FortiFi argues that Cal. Bus. & Prof. Code § 7159.2(b)—Count V— "only applies to home improvement contracts between a homeowner and a contractor." Dkt.

29-1 at 21.  Granted, but so what?  FortiFi admittedly made a $69,003 "loan secured by a mortgage on real property," specifically "to fund goods or services pursuant to a [purported] home improvement contract" between Plaintiffs and Eco Tech.  Cal. Bus. & Prof. Code § 7159.2(b).[10]   The statute obligates the "*the person or entity making the loan* [FortiFi] to pay a contractor [Eco Tech] "only" by "an instrument payable to the borrower," or "through a third-party escrow agent."  *Id.*  Here, FortiFi left Plaintiffs completely out of the loan disbursement process, to conceal from Plaintiffs the very existence of a "loan secured by a mortgage on [Plaintiffs'] property."  *Id.*  FortiFi, as "the person or entity making the loan," paid purported home improvement "contractor" Eco Tech an amount greater than $5,000 in a manner expressly excluded by § 7159.2(b).  FortiFi is thus liable under § 7159.2(b).

## C.    PLAINTIFFS' $1,000 ARE RECOVERABLE ON THE MERITS

FortiFi contends that Plaintiffs' $1,000 of interest charges—which they incurred to make timely payments on their fake PACE loans—are somehow "too remote" to recover under the civil RICO statute (18 U.S.C. § 1964(c)).  *See* Dkt. 29-1 at 11-12.  That is legal nonsense, and wishful thinking by the defense.  The Ninth Circuit has held that a RICO plaintiff's time spent "research[ing] and compil[ing] records" to respond to a fraud, and money spent paying "an assistant to help her" respond, constitute recoverable RICO damages.  *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1119 (9th Cir. 2017).  Plaintiffs incurred personal monetary losses to "respond to" (make payments on) the PACE debts that FortiFi created.  This is a recoverable RICO injury.

Moreover, Defendants present no argument, statute or case law to suggest that Plaintiffs' $1,000 are "too remote" to recover under the laws governing Plaintiffs' seven other causes of action for damages (Counts IV through X).  Consequently, at

---

[10] The California Civil Code defines "mortgage" to mean "a contract by which specific property, including an estate for years in real property, is hypothecated for the performance of an act, without the necessity of a change of possession."  Cal. Civ. Code § 2920.  PACE assessments are putatively "contract[ual]" assessments, by which "specific property" is "hypothecated" for the repayment of a loan.  *Id.*

this stage, Defendants have waived any argument that Plaintiffs' $1,000 are unrecoverable on the merits of those seven causes of action. *See, e.g., Eckhardt v. State Farm Bank, FSB*, 2019 WL 1177954, at *8 (C.D. Ill. Mar. 13, 2019) ("The Court declines to step into the role of advocate to make Defendant's argument for it and therefore denies as waived Defendant's motion to dismiss Count V.").

## IX.    **CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request that this Court deny in full Defendants' motion to dismiss the FAC.

Dated: February 8, 2021                          Respectfully submitted,

FINKELSTEIN & KRINSK LLP


By:    *s/ David J. Harris, Jr.*
           David J. Harris, Jr., Esq.

djh@classactionlaw.com
501 West Broadway, Suite 1260
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

*Counsel for Plaintiffs and
the Putative Classes*